IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANDRE DIMMINGS, | ) | CASE NO. 1:13-cv-00146 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Andre Dimmings ("Plaintiff" or "Dimmings") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.  As explained more fully below, the Administrative Law Judge improperly rejected the opinion of the Medical Expert Dr. Plotkin that Dimmings met or equaled a Listing[2] without taking further steps to adequately develop the record and the ALJ did not sufficiently explain his Step Three analysis.  Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consist with this Opinion.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

## I.  Procedural History

Dimmings filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on January 28, 2008.[3]  Tr. 75, 76, 92-94, 95-97, 98-102.  He alleged a disability onset date of June 2, 2005 (Tr. 92, 95, 113), and claimed disability based on back and leg pain (Tr. 77, 80, 113).  After initial denial by the state agency (Tr. 75, 77-79), and denial upon reconsideration (Tr. 76, 80-81), Dimmings requested a hearing (Tr. 82).  On July 7, 2010, Administrative Law Judge Peter R. Bronson ("ALJ") conducted an administrative hearing.  Tr. 38-74.

In his July 28, 2011, decision (Tr. 5-20), the ALJ determined that Dimmings had not been under a disability from June 2, 2005, the alleged onset date, through December 31, 2010, the date last insured.  Tr. 8, 16.  Dimmings requested review of the ALJ's decision by the Appeals Council.  Tr. 4.  On December 5, 2012, the Appeals Council denied Dimmings' request for review, making the ALJ's decision the final decision of the Commissioner.[4]  Tr. 1-3.

## II. Evidence

### A.  Personal, educational and vocational evidence

Dimmings was born in 1961.  Tr. 41, 92, 95, 108, 156, 176.  He has a daughter whom he takes care of with the help of his daughter's mother.  Tr. 162, 522.  He completed the 11th grade

---

[3] Dimmings' applications were filed on January 28, 2008, with a protective filing date of January 14, 2008.  Tr. 108, 176.

[4] The ALJ's decision relates to Dimmings' DIB application.  Tr. 8.  Dimmings' SSI application may have been denied because he was receiving workers compensation benefits at the time.  Tr. 45-46.  Therefore Dimmings' SSI application was not before the ALJ for a disability determination.  Tr. 8, 45-46.  Dimmings does not assert error with respect to the ALJ's failing to consider his SSI application.

2

(Tr. 41, 120) and his past work includes work as a machine operator (Tr. 114, 122, 190).[5]
Dimmings last worked on June 2, 2005. Tr. 42.

**B.     Testimonial evidence**

    **1.     Dimmings' testimony**

Dimmings testified and was represented by counsel at the administrative hearing. Tr. 41-46, 50, 62-63. Dimmings stated that he was disabled because of pain in his back and legs.[6] Tr. 42. He indicated it is hard for him to sit. Tr. 42. He can sit for about 10 minutes at a time.[7] Tr. 43. When he walks, the pain goes down through his legs. Tr. 42. Dimmings can walk for about 15 minutes before the pain starts. Tr. 43. He can stand in place for about 15 minutes. Tr. 43. He cannot lift and carry 5 pounds of sugar but can lift and carry a gallon of milk. Tr. 42. Dimmings cannot handle steps well and cannot stoop, crouch, squat, kneel, or crawl. Tr. 43-44. His ability to bend at the waist is limited. Tr. 44.

To deal with the pain, Dimmings has received injections. Tr. 42. He takes Motrin for the pain. Tr. 44-45. He had been taking a prescription medication but was unable to afford it. Tr. 45.

    **2.     Medical Expert's testimony**

At the ALJ's request, Franklin Plotkin, M.D., testified as a Medical Expert ("ME") at the administrative hearing. Tr. 46- 60, 89. Prior to providing his opinions, Dr. Plotkin stated his

---

[5] He has operated different types of machines, including milling, grinding, and stamping machines. Tr. 114.

[6] Dimmings also indicated that he has high blood pressure but stated that his blood pressure medication was working. Tr. 44. Dimmings' counsel also indicated that Dimmings had an injury to his left knee and he had a tendon repair to that knee. Tr. 45.

[7] During the hearing, Dimmings had to stand at times. Tr. 46.

3

professional qualifications.[8]  Tr. 47.  The ALJ noted that some of the records had just been provided to Dr. Plotkin that day.  Tr. 47.  Dr. Plotkin stated that he had reviewed as much of the record as he was able to and had scanned the occupational and physical therapy records that he had just received that day.  Tr. 47.

Dr. Plotkin summarized Dimmings' medical history.  He indicated that the medical records showed that, in 2001, Dimmings was moving some boxes, felt a pop in his lower back and felt pain radiating down into his buttocks and left lower extremity.  Tr. 48-49, 196.  Then, in June of 2005, while at work, Dimmings jumped down off a tow motor and felt pain in his lower back.  Tr. 49.  Since the 2005 incident, Dimmings has continued to have chronic pain.  Tr. 49, 214-313.  Dr. Plotkin stated that MRIs and other imaging were performed and showed a herniation of a disc at L4 and 5; some compression of the L4 nerve root on the left; and foraminal stenosis in L4 and 5.  Tr. 49.  In March of 2007, Dimmings underwent a percutaneous discectomy for intractable left lower back pain and left lower extremity pain.  Tr. 49, 262-263.  Dr. Plotkin indicated that Dimmings received little relief and, although it was thought that further surgical intervention might be needed, Dimmings had not had another surgical procedure.  Tr. 49.  He had received steroid shots to facet joints and epidural shots and has taken medication to relieve the pain.  Tr. 49.

In summary, Dr. Plotkin opined that Dimmings suffers from chronic pain in the low back as well as both lower extremities.[9]  Tr. 50.  Dr. Plotkin further opined that Dimmings met or

---

[8] At the time of the hearing, Dr. Plotkin was a board-certified internist who had been in practice for over 40 years. Tr. 46-47, 85.  He was licensed to practice medicine in Ohio.  Tr. 47, 85.

[9] Dr. Plotkin also discussed Dimmings' knee problems and hypertension but noted that those issues had been resolved and/or were being controlled with medication.  Tr. 50.  In June of 2008, Dimmings fell down stairs and ruptured his left patella tendon, which he had to have repaired surgically.  Tr. 50.  Thereafter, Dimmings underwent a lot of physiotherapy on the left lower extremity to strengthen his quadriceps.  Tr. 50.  Dr. Plotkin indicated that the medical records showed that the surgery on Dimmings' knee had helped.  Tr. 50, 481-497, 498-521, 522-635, 636,

4

equaled Listing 1.04. Tr. 52. Following his testimony that Dimmings met or equaled Listing 1.04, the ALJ asked Dr. Plotkin a series of follow up questions:

> Q      All right. Let's look at 1.04. Okay. Okay. I think you mentioned earlier - - all right. Do we have, in this case, degenerative disc disease, osteoarthritis or facet arthritis?
>
> A      Yes, we do.
>
> Q      Yes. Do we have compromise of the nerve root?
>
> A      Yes, we do.
>
> Q      All right. Do we have evidence of limitation of motion of the spine?
>
> A      Yes.
>
> Q      How about motor loss?
>
> A      Well, that's controversial. He had weakness described in the quadriceps - -
>
> Q      Yes.
>
> A      - - and it's Exhibit 4.
>
> Q      Yes.
>
> A      And following that, he had a statement saying no muscle weakness - -
>
> Q      Yes.
>
> A      - - Exhibit 5.
>
> Q      Yes. Okay. To continue, do we evidence in the record of sensory loss?
>
> A      No.
>
> Q      How about reflex loss?
>
> A      No.
>
> Q      Evidence of positive straight-leg raise test?

---

637-665. During the hearing, Dimmings confirmed that he now was able to bend his knee. Tr. 50. Dr. Plotkin also noted that Dimmings had hypertension, which Dimmings controls with medication. Tr. 50.

A      I believe so.  This was in that hundred-page physiotherapy records, where there was some - -

Q      Yes.

A      - - pain on straight-leg raising.

Q      Yes.  Do we have here evidence of pseudoclaudication?

A      No.

Q      And was there ever a time when Mr. Dimmings needed to walk with a walker or two canes?

A      Only when he had the patella rupture - -

Q      Yes.

A      - - the tendon rupture.

Q      Yes.  And for how long a time did he need those assistive devices to walk?

A      Several weeks.

Q      All right.  But not a year?

A      No.

Tr. 52-54.

The ALJ then asked Dr. Plotkin his opinion with respect to Dimmings' residual functional capacity ("RFC").  Tr. 54.  Dr. Plotkin opined that he thought Dimmings was limited to sedentary work (Tr. 54, 57), with additional postural limitations, including crawling and bending (Tr. 57).  He indicated that, since Dimmings had trouble sleeping and getting proper rest, he would not be able to keep a punctual schedule.  Tr. 58.  Also, he indicated that Dimmings might have difficulties performing activities over a period of time.  Tr. 58-59.  When Dr. Plotkin provided his opinion about Dimmings' RFC, the ALJ asked him questions about a July 16, 2009, discharge summary from the Chronic Pain Rehabilitation Program.  Tr. 54, 522-

6

525. Dr. Plotkin was unable to explain certain terms contained in the discharge summary, including UAB and Waddell sign. Tr. 56. Dr. Plotkin and the ALJ appeared to disagree about the meaning of some aspects of the discharge summary, including whether the outcome measures reflected accomplishments or goals. Tr. 57.

### 3. Vocational Expert's testimony

Vocational Expert ("VE") Ted S. Macy testified at the hearing. Tr. 61-71. Following some clarification by Dimmings as to the amount of training that was required with respect to his machine operator work (Tr. 62-63), the VE described Dimmings' past machine operator work as a medium, semi-skilled production machine operator position. Tr. 63.

The ALJ proceeded to ask the VE a series of hypotheticals. Tr. 64. For all the hypotheticals, the ALJ instructed the VE to assume a person with the same age (born in 1961), educational background (dropped out of school after completing the 11th grade and never received a high school diploma), and past relevant work experience as Dimmings. Tr. 64.

In his first hypothetical, the ALJ described an individual who was limited to sedentary work with the following additional limitations: a sit/stand option, meaning that the person must be able to go from either stand or walk to sit and from sit to either stand or walk at least once every 15 minutes, but not in a way that requires cessation of work; and no climbing ladders, ropes or scaffolds at all. Tr. 64-65. The VE indicated that the described individual would be unable to perform Dimmings' past relevant work because his past work exceeded the physical restrictions of sedentary work. Tr. 65. However, the VE indicated that there were other jobs in the regional or national economy that the individual could perform, including (1) bench assembler, normally a light job,[10] with about 300 jobs available regionally, about 1,500 jobs

---

[10] Since bench assembler is normally a light job, the VE had to eliminate jobs to account for the sedentary hypothetical. Tr. 65.

7

available statewide, and about 60,000 jobs available nationally; (2) wire worker, normally a light job,[11] with about 400 jobs available regionally, about 2,000 jobs available statewide, and about 65,000 jobs available nationally; and (3) final assembler, a sedentary job, with about 600 jobs available regionally, about 3,000 jobs available statewide, and about 90,000 jobs available nationally.[12]  Tr. 65-69.

In his second hypothetical, the ALJ described the individual in his first hypothetical but added the additional limitation of being off task at least 15 percent of the time during the work day.  Tr. 69.  The VE indicated that, with that additional limitation, there would be no jobs available for the hypothetical individual.  Tr. 69.

In his third hypothetical, the ALJ described the individual in his first hypothetical but added the additional limitation of being absent from work, on average, at least 3 days per month because of impairments.  Tr. 70.  The VE indicated that the additional limitation would require a special accommodation resulting in less than 100 jobs available regionally and an insignificant number available nationally.  Tr. 70.  In response to questions from Dimmings' counsel, the VE indicated that work tolerances for absenteeism vary but stated that two days per month is on the edge of acceptability.  Tr. 70-71.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

---

[11] Since wire worker is normally a light job, the VE had to eliminate jobs to account for the sedentary hypothetical. Tr. 66.

[12] In providing the number of available jobs, the VE based his testimony on 2006 statistics from the U.S Department of Labor.  Tr. 68-69.  Thus, the VE acknowledged that adjustments would probably need to be made to the numbers that he provided because of a rise in unemployment since 2006.  Tr. 69.

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[13] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[13] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

20 C.F.R. §§ 404.1520, 416.920;[14] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his July 28, 2011, decision, the ALJ made the following findings:[15]

1. Dimmings met the insured status requirements through December 31, 2010. Tr. 10.

2. Dimmings had not engaged in substantial gainful activity during the period from his alleged onset date of June 2, 2005, through his date last insured of December 31, 2010. Tr. 10.

3. Through his date last insured, Dimmings had the following severe impairments: herniated disc at L4-L5 status post percutaneous discectomy, left facet hypertrophy at L5-S1, and chronic pain syndrome. Tr. 10.

4. Through his date last insured, Dimmings did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, including the Listing for disorders of the spine, Listing 1.04. Tr. 11.

5. Through the date last insured, Dimmings had the RFC to perform a range of sedentary work except he had to be able to alternate between sitting and standing/walking once every 15 minutes and was precluded from work that required climbing ladders, ropes or scaffolds. Tr. 11-14.

6. Through his date last insured, Dimmings was unable to perform any past relevant work. Tr. 14.

7. Dimmings was born in 1961 and, on the date last insured, was 49 years old. Tr. 15.

---

[14] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[15] The ALJ's findings are summarized.

      8.      Dimmings had a limited education and was able to communicate in English.  Tr.15.

      9.      Transferability of job skills was not material to the determination of disability.  Tr.15.

      10.      Through his date last insured, considering Dimmings age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Dimmings could have performed, including bench assembler, wire worker, and final assembler. Tr. 15.

Based on the foregoing, the ALJ determined that Dimmings was not under a disability from June 2, 2005, the alleged onset date, through December 31, 2010, the date last insured.  Tr. 15-16.

### V. Parties' Arguments

**A.**      **Plaintiff's arguments**

First, Dimmings argues that the ALJ did not appropriately address whether his orthopedic impairment equaled Listing 1.04.  Doc. 15, pp. 10-13.  In connection with this argument, Dimmings asserts that, without obtaining new testimony or ordering a consultative evaluation, the ALJ improperly rejected the Medical Expert Dr. Plotkin's opinion that Dimmings met or equaled Listing 1.04.   Doc. 15, pp. 10-13.  Also, Dimmings asserts that the ALJ's reasons for rejecting that testimony are not supported by the record.  Doc. 15, pp. 11-13.

Second, Dimmings argues that the ALJ's credibility determination is faulty and not supported by substantial evidence.  Doc. 15, pp. 13-18.  In connection with his credibility argument, Dimmings asserts that, because the ALJ did not account for alleged problems with being punctual and staying on task in the RFC, the RFC is not supported by substantial evidence. Doc. 15, pp. 18-19.  Dimmings relies on Dr. Plotkin's testimony, which included his opinion that Dimmings' problems with getting sleep could interfere with his ability to be punctual and sustain

11

work activity (Tr. 58-59), and Dr. Edward C. Covington's[16] recommendation that Dimmings continue to pursue disability and his advice that temporary firms were Dimmings' best option for work in the future (Tr. 525).  Doc. 15, p. 18.

**B.     Defendant's arguments**

In response, Defendant argues that the ALJ's determination that Dimmings did not meet or equal Listing 1.04 is supported by substantial evidence and that the ALJ rightfully rejected Dr. Plotkin's opinion.  Doc. 16, pp. 13-15.

Defendant also argues that the ALJ considered Dimmings' subjective complaints of pain and properly determined that those complaints were not credible to the extent alleged by Dimmings.  Doc. 16, pp. 16-19.  Defendant notes that, even though the ALJ found Dimmings' complaints of pain not fully credible, the ALJ credited Dimmings' testimony to a significant degree and limited Dimmings to a reduced range of sedentary work.  Doc. 16, p. 18.

With respect to Dimmings' argument that the RFC is not supported by substantial evidence, the Commissioner asserts that, although the RFC does not account for limitations in punctuality and ability to sustain work activity, the RFC is supported by substantial evidence.  Doc. 16, pp. 18-19.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

---

[16] In May 2008, upon the referral of Dr. Leo Kapural, the physician who performed Dimmings' disc decompression, Dr. Covington of the Cleveland Clinic Foundations conducted a Pain Medicine Evaluation.  Tr. 491-493.  Dr. Covington recommended that Dimmings receive treatment in the Chronic Pain Rehabilitation Program on a daycare basis for approximately 3 weeks.  Tr. 493.  Following Dimmings' participation in that program, Dr. Covington completed a discharge summary. Tr. 522-525.

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.  **The ALJ improperly rejected the opinion of the Medical Expert Dr. Plotkin without taking further steps to adequately develop the record and the ALJ did not sufficiently explain his Step Three analysis**

Dimmings argues that the ALJ erred at Step Three when he concluded that Dimmings' impairments did not meet or equal Listing 1.04.[17] Doc. 15, pp. 10-13. Dimmings asserts that,

---

[17] Listing 1.04 relates to "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the caudia equina) or the spinal cord. With:

  A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

  B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

  C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 1.04.

13

without obtaining new testimony or ordering a consultative evaluation, the ALJ improperly rejected Medical Expert Dr. Plotkin's opinion that Dimmings suffered from chronic pain syndrome and that his impairment met or equaled Listing 1.04. Doc. 15, pp. 10-11. For the reasons more fully explained below, the Court agrees.

A claimant who is found to have an impairment that meets or medically equals a Listing at Step Three is entitled to benefits regardless of an ALJ's conclusions at Steps Four or Five. *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. April 1, 2011).

Here, in his Step Three analysis, the ALJ set forth the requirements of Listing 1.04 and simply stated "[t]here is no medical evidence in the record that would *meet* the requirements of Listing 1.04." Tr. 11 (emphasis supplied). The ALJ did not discuss the medical evidence or compare it to the requirements of Listing 1.04. He did not discuss Dr. Plotkin's opinion testimony relative to Listing 1.04 nor did he discuss whether Dimmings' impairment *equaled* a Listing. Later, in the RFC section, it appears that, even though the ALJ had limited Dimmings to sedentary work in the RFC, the ALJ concluded that Dimmings' impairment did not *equal* a Listing because he was capable of medium exertional work. More particularly, the ALJ stated: "I find that an impairment that limits a claimant to work at only the medium exertional level does not come close to meeting the requirements of Listing 1.04 or any other muscoskeletal impairment Listing under category 1.00." Tr. 14. In that same section, the ALJ stated that he was providing little weight to Dr. Plotkin's opinion that Dimmings met or equaled Listing 1.04 and listed his reasons for that weight.

Although the ALJ provided reasons for rejecting Dr. Plotkin's opinion, his reasons are unsupported by or in conflict with the record evidence and/or the ALJ's own RFC finding. Further, his reasons run contrary to an ALJ's duty to develop a full and fair record. *See Lashley*

*v. Sec. of Health and Human Serv.*, 708 F.2d 1048, 1051 (6th Cir. 1983); *see also Williams v. Massanari*, 171 F.Supp.2d 829, 833 (N.D. Ill. 2001).  Even though the ALJ's duty to develop the record in this case may not have been "heightened" and even though an ALJ is not required to call a medical expert,[18] here the ALJ did determine that a medical expert was required and summoned that expert to the administrative hearing to testify in part about medical equivalency. Tr. 89-90.  *See also Williams*, 171 F.Supp.2d at 834 (indicating that a medical expert need not always be called but because the ALJ decided to call a medical expert, the ALJ had created a presumption that a medical expert was necessary).  It is against this backdrop that the Court considers whether the ALJ's reasons for providing little weight to Dr. Plotkin's opinion are sufficiently supported by the record and/or can be deemed good reasons.

The ALJ's first reason for discounting Dr. Plotkin's opinion was that "Dr. Plotkin is only board certified in internal medicine and not orthopedics, and he was not familiar with several terms contained in Mr. Dimmings' records including UAB and Waddell signs." Tr. 14.  The Commissioner suggests that the ALJ's reason was proper because it took into account Dr. Plotkin's lack of specialization.  Doc. 16, p. 15.  Specialization is a factor that may be considered under 20 C.F.R. § 416.927(c)(5) when evaluating medical opinions.  However, in light of the fact that the ALJ chose Dr. Plotkin, who was not an orthopedic specialist (Tr. 46-48, 89-90), to serve as a medical expert in this case and allowed his testimony to proceed even after Dr. Plotkin acknowledged that he was unfamiliar with terms that the ALJ was requesting an opinion on (Tr. 56), the Court is unable to conclude that the ALJ's reliance upon a lack of specialization is a proper or sufficient basis to reject Dr. Plotkin's opinion.  Having made the determination that a

---

[18] *See* 20 C.F.R. § 416.927(e)(iii) (indicating that an ALJ *may* ask for and consider medical expert opinions on the nature and severity of a claimant's impairment and on whether a claimant's impairment equals a Listing).

medical expert was necessary, if the ALJ had felt that Dr. Plotkin was not sufficiently qualified, the ALJ should have taken steps to resolve his concerns regarding the lack of specialization.

The ALJ's second reason for discounting Dr. Plotkin's opinion was that "Dr. Plotkin did not appear to be familiar with Ex. 12F, particularly the discharge summary from Mr. Dimmings' inpatient treatment program from the summer of 2009." Tr. 14. However, the record does not support this determination. While Dr. Plotkin indicated that he had only had a chance to scan the occupational and physical therapy records because he had just received some of the exhibits on the day of the hearing, (Tr. 47), the record demonstrates that, during the hearing, Dr. Plotkin considered the portion of Ex. 12F that the ALJ claims Dr. Plotkin was not familiar with, i.e,. the discharge summary. For example, when the ALJ asked Dr. Plotkin questions about the discharge summary, Dr. Plotkin answered while looking at the discharge summary. Tr. 56. Dr. Plotkin disagreed with the ALJ's suggested interpretation of certain portions of the discharge summary, including whether the outcome measures reflected accomplishments or goals. 57. Further, to the extent that Dr. Plotkin had not had sufficient time to review the records, as discussed above, it was the ALJ's duty to adequately develop the record. Thus, without some indication that claimant was at fault for the medical expert not receiving the records in a timely manner, the Court is unable to conclude that the ALJ's reliance upon an alleged lack of familiarity with records is a proper or sufficient basis to reject Dr. Plotkin's opinion. Having made the determination that a medical expert was necessary, if the ALJ had felt that Dr. Plotkin was not sufficiently prepared, the ALJ should have taken steps to resolve his concerns with respect to Dr. Plotkin's familiarity with the records.

The ALJ's third reason for discounting Dr. Plotkin's opinion was that "Dr. Plotkin's opinions are not consistent with the report of Mr. Dimmings' treating provider from that

16

[summer of 2009] inpatient program, Edward C. Covington, M.D., who stated that Mr. Dimmings was at his discharge capable of lifting and carrying 50 pounds and able to perform work at the medium exertional level (Exhibit 12F, pages 3-4), nor are they consistent with the opinions of Dr. Bell or Dr. Lavelle that there is no objective medical evidence to account for Mr. Dimmings' alleged symptoms." Tr. 14. As noted above, Dr. Plotkin considered the discharge summary that the ALJ says is inconsistent with Dr. Plotkin's opinion and stated his disagreement with the ALJ's interpretation of a portion of that report. Also, the opinions of Dr. Lavelle and Dr. Bell were part of the record that Dr. Plotkin reviewed when he rendered his opinion. Further, the ALJ does not clearly state what specific portions of Dr. Plotkin's opinion the ALJ deemed to be inconsistent with the opinions of Dr. Covington, Dr. Lavelle, and/or Dr. Bell. Thus, it is not clear that the ALJ's third reason is fully supported by the record.

Even if the ALJ is correct and Dr. Poltkin's opinion was inconsistent with those opinions, after rejecting Dr. Plotkin's opinion, the ALJ proceeded to reach a conclusion with respect to medical equivalency that is at odds with his own RFC finding. The ALJ concluded, "I find that an impairment that limits a claimant to work at only the medium exertional level does not come close to meeting the requirements of Listing 1.04 or any other muscoskeletal impairment Listing under category 1.00." Tr. 14. However, in the RFC, the ALJ limited Dimmings to sedentary work. Tr. 11. The Court recognizes that, when the ALJ limited Dimmings to sedentary work, the ALJ stated he felt that Dimmings' testimony with respect to his functional abilities was not consistent with medical source statements in the file, particularly those after his inpatient treatment program (Ex. 12F, pages 1-4), but indicated that he was giving Dimmings the benefit of the doubt and limited him to sedentary work. Tr. 12. However, the fact is that the ALJ made the decision to limit Dimmings in the RFC to sedentary work. Then, within that same RFC

section, the ALJ proceeded to discount Dr. Plotkin's opinion partially in reliance upon the same medical evidence upon which the ALJ provided Dimmings the benefit of the doubt and concluded that, because his impairment limits him to work only at the medium level, Dimmings does not come close to meeting a Listing.  The ALJ does not explain why he deviated from his own RFC finding to support his conclusion with respect to the Listings and thus does not allow this Court an opportunity for meaningful review of his Listing determination.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. April 1, 2011) (indicating that without an evaluation of the evidence, comparison of that evidence to the Listings and an explained conclusion, meaningful judicial review cannot occur).

Here, the ALJ made the decision to call a Medical Expert.  If the ALJ determined during or after the hearing that the ME chosen by him was not qualified or was ill prepared because of the late receipt of medical records, the ALJ could have postponed the hearing or selected a more suitable Medical Expert.   He did not.  Instead, he discounted the Medical Expert's opinion for reasons partially within his control and thereafter, in essence, interpreted medical evidence without the aid of a Medical Expert even though he had originally made the determination that a Medical Expert was necessary.  Moreover, as discussed, the ALJ's medical equivalency determination included within his RFC determination is inconsistent with his own sedentary RFC finding.  Accordingly, the Court finds that reversal and remand is warranted for further analysis of Dimmings' impairment under Step Three and, to the extent necessary, reassessment of Dimmings' impairment under Steps Four and Five.[19]

---

[19] This Opinion is not based on a determination that an ALJ is required to accept a medical expert's opinion simply because an ALJ calls a medical expert.  Nor should this Opinion be construed as requiring a determination on remand that Dimmings is in fact disabled.

### B. Other issue

Dimmings also argues that reversal and remand are warranted because the ALJ erred in assessing his credibility.  As discussed herein, the Court is ordering remand to allow for further consideration of Dimmings' impairment.  Since further proceedings on remand may impact the ALJ's findings, it is not necessary for the Court to address Dimmings' credibility argument. *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

### VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this Opinion.

Dated:  January 27, 2014

Kathleen B. Burke
United States Magistrate Judge